UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

PATRICIA RIFFEY,

      Plaintiff,

    v.

HEWLETT-PACKARD COMPANY
DISABILITY PLAN,

      Defendant.

NO. CIV. S-05-1331 FCD/JFM

<u>MEMORANDUM AND ORDER</u>

----oo0oo----

    This matter is before the court on the parties' cross-motions for summary judgment in this case arising out of defendant Hewlett-Packard Company Disability Plan's ("defendant" or the "Plan") denial of plaintiff Patricia Riffey's ("plaintiff") claim for long-term disability ("LTD") benefits.[1]

    For the reasons set forth below, the court finds that the proper standard of review of this matter is abuse of discretion, as opposed to de novo, and thereunder, the court cannot find that

_____

    [1]   Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.   <u>See</u> E.D. Cal. L.R. 78-230(h).

1

defendant acted arbitrarily or capriciously in denying

plaintiff's LTD benefits claim.  As such, the court GRANTS

defendant's motion for summary judgment and DENIES plaintiff's

motion.

**BACKGROUND**[2]

**A.   VPA Determines Benefits Claims Under the Plan**

Hewlett-Packard Company ("HP" or the "Company") adopted the

Plan[3] to provide its employees with income in the event of

certain disabilities.  The Plan is entirely self-funded by HP and

not insured through any insurance company.  (Ex. B, § 4,

HP580-81, HP609.)  Voluntary Plan Administrators, Inc. ("VPA") is

the Plan's claims administrator under the ASA between HP and VPA.

(Ex. B, § 2(a), HP570; Ex. D.)  For VPA to approve a claim for

_____

[2]    The following statement of the facts is primarily drawn
from defendant's motion for summary judgment (Docket #25), as the
facts stated therein derive from the underlying administrative
record and Plan documents.  Moreover, plaintiff does not dispute
the essential facts as stated by defendant.  Indeed, plaintiff
did not recount a full description of the underlying facts in her
cross-motion or opposition papers; instead, plaintiff largely
relied on the facts as stated by defendant but argued different
legal ramifications of those facts when reviewed under what
plaintiff contends is the correct standard of review (de novo or
"low deference"--abuse of discretion).

[3]    The Plan is attached as Exhibit B to the Declaration of
Janet Curry, filed in support of defendant's motion for summary
judgment (Docket #s 26-39 [Curry Decl. and exhibits thereto])
("Curry Decl.").  The Plan bears the production number range of
HP564-619.  All further references to the Plan will be to "Ex. B"
and where appropriate, to the applicable section and production
number.  The Summary Plan Description ("SPD") for the Plan is
attached as Exhibit C to the Curry Decl. and bears the production
number range of HP620-35.  References to the SPD herein will be
to "Ex. C" and where appropriate, to the applicable section and
production number.  The Administrative Services Agreement ("ASA")
is attached to the Curry Decl. as Exhibit D and bears the
production number range of HP636-92.  Further references to the
ASA will be to "Ex. D" and where appropriate, to the applicable
section and production number.

LTD benefits, a "Member" must establish that he or she is "Totally Disabled" as defined under the Plan.  (Ex. B.)  VPA must make the determination of "Total Disability" on the basis of "objective medical evidence."  (<u>Id.</u>)  The Plan defines "objective medical evidence" as "evidence establishing facts or conditions as perceived without distortion by personal feelings, prejudices or interpretations."  (Ex. B, § 2(o), HP574.)  The Member is "solely responsible for submitting . . . any other information or evidence on which the claimant intends the Claim Administrator to consider in order to render its decision on review."  (Ex. B, § 8(b), HP615.)

Benefits are not paid from VPA's assets.  (Ex. B, § 4(e)-(f), HP581; Ex. D, § VII.A-B, HP641.)  VPA is compensated based upon a flat quarterly fee, not on the number of claims processed, the dollar amount paid out, or the number of claims denied.  (Ex. D, § VII.A-B, HP641.)

**B.   <u>VPA's Discretion</u>**

Numerous Plan provisions grant VPA discretionary power to determine eligibility for benefits both in the Plan as enacted in 1998 and in the amendments effective January 1, 2002. Specifically, the Plan, as amended, provides that:

> The Company is the named fiduciary which has the discretionary authority to act with respect to any appeal from a denial of benefits.  The Company's discretionary authority includes the authority to determine eligibility for benefits and to construe the terms of the Plan.  The Claims Administrator [VPA] shall administer the review of denied claims on the Company's behalf and make the decision on review.

(Ex. B, § 8(a), HP614.)  The original 1998 version of the Plan contained the same language; the 2002 amendment simply

3

substituted the word "Company" for the word "Organization,"
referencing the Hewlett-Packard Company Employee Benefits
Organization.  (Ex. B, *compare* HP614 with HP594.)  In addition,
Section 8(c) of the 1998 Plan states:

> The Claims Administrator [VPA] will make the decision on
> review in conformance with procedures it has developed in
> the normal course of its business, and the claimant will
> be notified promptly and in writing of the decision.  *The
> Claims Administrator shall have the discretionary power to
> construe the language of the Plan and make the decision on
> review on behalf of the Organization.*  To the extent the
> Plan language does not address a claim or to the extent the
> Claims Administrator is unable to construe the Plan
> language, the Claims Administrator shall consult with the
> Organization prior to making a decision on review.

(Ex B, HP596 [emphasis added].)  Likewise, the 2002 amendment now
separates that provision into a new Section 8(e), but with no
change in the operative language.  (Ex. B, § 8(e), HP617.)  The
Plan also vests discretionary authority in VPA, as claims
administrator, to determine "Total Disability" on the "basis of
objective medical evidence" and to "process[] claims."  (Ex. B,
§§ 2(a), (o), 4(f), 7(b).)

   C.   **"Total Disability" Under the Terms of the Plan**

        For VPA to approve a claim for benefits, a Member must
establish that he or she is "Totally Disabled" as defined under
the Plan.  "Total Disability" is defined differently depending
upon whether a claimant is seeking short-term disability or LTD
benefits.  (Ex. B, § 2(o), HP573.)  A Member applying for
short-term disability benefits must show that "following the
onset of the injury or sickness, the Member is continuously
unable to perform each and every duty of his or her Usual
Occupation . . . ."  (<u>Id.</u> at § 2(o)(I).)  A Member's "Usual
Occupation" is defined as the normal work assigned to the Member

4

by HP.  (Ex. B, § 2(t), HP576-77.)  If a Member qualifies, he or

she is entitled to receive up to a maximum of 52 weeks of short

term disability benefits.  (Ex. B, §§ 2(o)(I) and 2(t).)

In contrast, a Member, such as plaintiff, who is applying for LTD

benefits, must show that after the initial 52-week period of

receiving short term disability benefits, "the Member is

continuously unable to perform any occupation for which he or she

is or may become qualified by reason of his or her education,

training or experience."  (Ex. B, § 2(o)(ii), HP573.)  The Plan's

claims administrator must make the determination of "Total

Disability" on the basis of "objective medical evidence," as said

terms are defined above.  (Id. at § 2(o), HP574.)

        The Plan also contains explicit limitations on LTD benefits.

In evaluating "Total Disability" for LTD benefits purposes, the

Plan imposes the following limitations on benefits for mental

illness:

        With respect to any Total Disability caused or contributed
        to by mental illness . . . the following limitations shall
        apply:

        (A)   Mental Illness

        During the period described in (ii) above [setting forth
        the definition of 'Total Disability' after the initial
        fifty-two-week period], in the case of a disability
        resulting from a nervous or mental disorder, the Member
        shall be considered Totally Disabled only if he or she is
        confined to a hospital or other licensed long term care
        facility for the treatment of such disability or has been
        so confined for fourteen (14) or more consecutive days
        during the preceding three (3) months.  An illness shall be
        considered a nervous or mental disorder if:

(Ex. B, § 2(o), HP574-75.)  Under the limitation above, absent a

Member's confinement to a hospital or long term care facility

meeting the Plan's requirements, a Member with a disability

5

resulting from a nervous or mental disorder is not considered

"Totally Disabled" under the explicit terms of the Plan.  (<u>Id.</u>)

### D.   <u>VPA's Denial of Plaintiff's Claim for LTD Benefits</u>

#### 1.   <u>Claims History</u>

Plaintiff was employed with HP as an Account Representative

in Customer Support until July 15, 2002, when she began short-

term disability.  (Curry Decl., Ex. A, HP433.)[4]  As part of her

claim for short-term disability benefits, her chiropractor,

Thomas Pesko, submitted a "Physician's Certificate for

Self-Insured Disability Benefits" dated July 30, 2002.  (Ex. A,

HP506.)  That form indicated that her diagnosis was cervical

segmental dysfunction and cervical myalgia and noted that she was

not fully disabled but could be on light duty with specified

physical limitations for four hours per day with five minute

breaks each hour to "stretch and move."  Her approximate return

to full-time work date was listed as August 30, 2002.  (<u>Id.</u>)

Plaintiff filed a claim for LTD benefits on April 15, 2003,

indicating that she was disabled due to neck pain, back pain,

shoulder pain and headaches.  (Ex. A, HP433, HP1.)  She stated

that these were caused by a previous surgery.  (<u>Id.</u>)  An

Attending Physician's Statement of Disability, dated April

19, 2003, submitted by Dr. Pesko listed her diagnosis as

"Cervical Seg. Dysfunction, Cervical Myalgia, Thoracic Seg.

Dysfunction."  (Ex. A, HP430.)

---

[4]     The administrative record is attached as Exhibit A to
the Curry Decl. and bears the production range HP1-563.  All
further references to the administrative record will be to "Ex.
A" and where applicable, the production number.

1     In order to review plaintiff's claim, on May 27, 2003, VPA
2  requested medical records from her doctors. (Ex. A, HP1.)
3  Disability Benefits Specialist Linda Kennedy reviewed the medical
4  records submitted by plaintiff's doctors in June and July of
5  2003. (Ex. A, HP1-2.)  In late July, on the basis of the
6  submitted evidence, Ms. Kennedy concluded plaintiff was "unable
7  to return to her past work" and sent her file to CorVel for a
8  transferable skills assessment, an evaluation of plaintiff's
9  ability to perform other types of work. (Ex. A, HP2.)  The
10 CorVel report stated that plaintiff would be able to perform work
11 "within her education level, benefits level, wage level and
12 physical work capacity" with accommodations. (Ex. A, HP2,
13 HP275-77.)  Based on the report, on September 4, 2003, Ms.
14 Kennedy recommended approval of plaintiff's LTD claim, as the
15 Plan provided plaintiff benefits if she could not perform any
16 occupation without accommodations. (Ex. A, HP2.)

17     On September 6, 2003, a VPA manager reviewed plaintiff's
18 claim and noted that additional medical records were needed to
19 evaluate her claim, since there were no "really" current records
20 in the file.  The VPA manager directed that plaintiff be sent to
21 a functional capacity evaluation ("FCE") so that VPA could
22 determine her current restrictions and limitations.  Plaintiff
23 had been participating in physical therapy and the VPA manager
24 noted that such therapy should have "produced improvements in her
25 systems." (Ex. A, HP3.)  Subsequently, Ms. Kennedy requested
26 additional medical records from plaintiff's doctors and asked
27 plaintiff to undergo a FCE at Healthsouth.  That evaluation
28 indicated plaintiff was capable of sedentary work *without*

1 accommodation.  (Id.)

2    On October 27, 2003, VPA wrote to plaintiff, denying her

3 initial claim.  (Ex. A, HP209-13.)  The letter reviewed the

4 medical records in her file along with the report of her FCE,

5 which indicated that she was capable of performing a sedentary

6 job, such as her former position.  (Id.; Ex. A, HP438.)

7    On April 22, 2004, plaintiff appealed the denial of her

8 claim and requested additional time to provide VPA with more

9 information.  (Ex. A, HP99-102.)  Plaintiff's attorney sent an

10 additional letter on May 4, 2004, enclosing additional medical

11 records and stating:

> As can be seen, the claimant deals with borderline high
> blood pressure and hyperlipidemia.  The more pertinent
> diagnoses for disability purposes are: reactive
> airway disease, dysphagia, headaches, arm numbness problems,
> and depression.  The headaches are essentially daily.  No
> clear cause for the arm numbness has been found, but there
> are myofascial tenderness in the neck and trigger points in
> the shoulders.  Medication tried for the depression had
> untenable side-effects.  Obviously my appeal focused on
> addressing the errors in the exertionally based analysis
> used to deny this claim, but it should be obvious that
> nonexertional factors of pain, including daily headache pain
> and neck pain, and fatigue and mental fogginess associated
> with the combination of impairments, depression, and
> medications, are more serious impediments to performance of
> any kind of work.

21 (Ex. A, HP57.)  On May 17, May 19 and July 23, 2004, counsel for

22 plaintiff submitted additional documentation regarding her

23 condition to VPA.  (Ex. A, HP23, HP25, HP29-30.)

24    On October 28, 2004, plaintiff's counsel submitted

25 additional documentation to support plaintiff's disability claim

26 to VPA.  (Ex. A, HP16.)  On November 4, 2004, VPA sent

27 plaintiff's counsel a letter indicating that VPA had called his

28 office in August (see HP4) to ask if additional information on

plaintiff's appeal was forthcoming and inquiring into the status

of her Social Security Disability claim but did not receive a

response.  (Ex. A, HP20.)  That letter also indicated that VPA

had received another extension request from his office on

November 1, 2004.  (Id.)

On January 20, 2005, plaintiff's counsel sent a letter to

VPA stating:

> I just came across your 11/4/04 letter inquiring about
> the status of Plaintiff's Social Security disability claim,
> misfiled in an unrelated file. [¶ ]  That claim is still
> ongoing.  Of note, an appeal was greatly delayed because of
> Ms. Riffey's psychological inability to complete a simple
> form.  Her psychiatrist had to write a note explaining this,
> in order to help excuse the delay.

(Ex. A, HP13.)  On January 30, her counsel submitted additional

information and noted:

> I believe you may think I continue to request additional
> time.  I did request additional time back when I made the
> formal appeal of 4/22/04.  However, I was able to provide
> additional medical information over the following month or
> so. [¶ ]  At this point, though, it appears that Ms. Riffey
> has significantly increased psychiatric symptoms,
> resulting from her original problems.  I am not sure how you
> want to handle this, but I could probably provide some
> specialized medical information in this regard within a
> limited time frame – so if you want to agree to hold this
> record open yet longer, it may be a good idea all the way
> around.

(Ex. A, HP14.)

On March 2, 2005, VPA sent a letter to Plaintiff's attorney

advising of its decision to deny her appeal. (Ex. A, HP10-12.)

The denial letter stated that, although plaintiff underwent

extensive testing, "the objective test results . . . do not

provide a clear condition that would be considered disabling for

Plaintiff.  Other than some documented changes of early

degenerative disc disease, plaintiff's test results were all

within normal limits." (Ex. A, HP11.) VPA also discussed the
more recent doctors' notes, which indicated that plaintiff's
symptoms had improved and a FCE which documented that "Ms. Riffey
was capable of performing work full-time at the sedentary level."
(Ex. A, HP12.) VPA also noted that plaintiff claimed disability
for depression and mental and nervous conditions cannot be taken
into account for LTD purposes unless she were confined to a
hospital or long term care facility. (Ex. A, HP11.)

> **2. Plaintiff's Medical History Concerning Her
> Reported Neck Pain, Headaches, Fatigue, and
> Depression Following Surgery to Remove a
> Zenker's Diverticulum**

Plaintiff underwent surgery to remove a Zenker's
diverticulum on November 7, 2001. (Ex. A, HP365, HP75.) In his
first examination of plaintiff following surgery, on November 28,
2001, her doctor, Keith Boston, indicated that plaintiff reported
fatigue, but wrote that she should "[r]echeck next August for
physical." (Ex. A, HP127.) On December 4, 2001, Dr. Boston saw
plaintiff and stated that she reported "persistent back pain,"
and he noted "[m]ild reactive depression." (Ex. A, HP126.) He
indicated that he "would concur with non-paid leave of absence
for the patient to recover." (Id.) His notes from an
examination two weeks later, on December 20, 2001, noted that
plaintiff is "noticeably better after chiropractic therapy."
(Ex. A, HP125.) He stated that her neck is "supple without
nodes," but that there is "significant myofascial tenderness in
the trapezius." He also stated that "[i]n general, patient's
affect is much brighter and she appears much more engaged and
less tearful today." He further noted that her "[m]ild reactive

10

depression" was "improving." (Id.) Similarly, on January 21, 2002, Dr. Boston indicated that "headaches and neck pain are improving. Depression is improving." (Ex. A, HP124.)

From this time through March 2004, the administrative record reflects Dr. Boston's reports that plaintiff continued to present with myofascial tenderness in the left trapezius and headaches. (Ex. A, HP87, HP89, HP95, HP97-98, HP114-15, HP118, HP356, HP527.) At times, he believed her symptoms to be improving. (Ex. A, HP118, HP120-21, HP525.) He also reported that she felt fatigued and depressed and prescribed her antidepressants, although her depression appeared to improve in March of 2004. (Ex. A, HP87, HP95, HP97, HP115-16, HP356.)

Dr. Boston's notes from August 19, 2003, indicate that plaintiff had reported that her "[h]eadaches persist on a daily basis." (Ex. A, HP91.) Although he stated that plaintiff has a history of depression, he did not note neck and back pain. (Ex. A, HP91-92.) He indicated that on examination her neck is "Supple without adenopathy, JVD or thyromegaly." (Ex. A, HP91.) Dr. Boston's February 20, 2004 notes state:

> She continues to feel poorly. She continues to hurt all the time. She is frustrated that no one is finding objective evidence of her problems. She now notes tingling in both hands and both feet though the left arm appears to be more pronounced than the right arm. She got approximately 50% transient reduction after her trigger point injection. She does note increasing depression and fatigue.

(Ex. A, HP88.) Dr. Boston prescribed pain medication and an anti-depressant and ordered an MRI to rule out a herniated cervical disc. (Id.)

During the relevant period, plaintiff was also under the care of the chiropractor, Dr. Pesko, who submitted her statements

of disability.  On August 29, 2002, he indicated that he believed

"6 more weeks of care should do her well, she may need periodic

follow up care."  (Ex. A, HP416-17.)  He stated that:

> [Ms. Riffey] was getting some counseling and her counselor
> suggested some time off work for healing she asked me
> if I would write her a disability slip, I wrote on
> August 12 for 3 months.

(Ex. A, HP417.)  He also noted decreased movement, "positive

right shoulder depression," and "Vertebral fixation noted at

C1-2, C4, T3-6 and right 2-3 rib heads."  (Ex. A, HP416.)  On

October 14, 2002, Dr. Pesko reported that plaintiff's pain and

headaches were improving.  (Ex. A, HP490.)  He found that "if she

continues to stretch and strengthen all cervical muscles along

with mid Thoracic muscle she should do better."  (Id.)  Dr. Pesko

recommended a decreased schedule of therapy. (Id.)

Dr. Pesko continued to report that plaintiff complained of

headaches and "C/T discomfort and pain" through March 2003. (Ex.

A, HP234-35, HP499.)  On March 18, 2003, he noted plaintiff's

continued complaints of "frequent C/T pain, moderate mostly with

associated posterior and suboccipital headaches," but indicated

that she had some improvement in her limitations on her range of

motion.  (Ex. A, HP235.)  Under "Objective Findings," Dr. Pesko

stated:

> Finding about the same as last report with some increase
> in C/T AROM mostly in B/L rotation.  Anterior cervical
> muscles weak doing with right SCM muscle.  Foraminal
> compression and left lateral compression positive C/T pain.
> Frequent fixations at C1, T4-5, and right third rib.
> (Id.)

Plaintiff's physical therapist, Katie Thorne, submitted

records to VPA dated from August 2002 to May 21, 2003, noting

plaintiff's complaints of "cervical, thoracic and upper extremity symptoms of pain and rapid fatigue," and noting "significant postural fatigue with a significantly collapsed posture, severe forward head position, thoracic kyphosis, upper cervical extension, and protracted scapulae bilaterally." (Ex. A, HP320-21, HP333, HP483-86.) On January 8, 2003, her report stated:

> Joint mobility testing of the cervical spine revealed a prominent C2 spinous process with C3 rotated to the right mildly and C3 tenderness. The C5-C6 is anteriorly oriented, though mobility is within normal limits.

(Ex. A, HP321.) Ms. Thorne also noted that plaintiff had "left anterior cervical restrictions" and "suboccipital muscular spasms" that were "more significant on the right vs. the left and appear to be the source of her headache symptoms." (Ex. A, HP321, HP322-24, HP326-38.) However, by May 21, 2003, Ms. Thorne noted some improvement, including that plaintiff's range of motion was within normal limits, and she was discharged from physical therapy to a home exercise program. (Ex. A, HP333.)

A report from Dr. Aditi Mandpe, an otolaryngologist, on November 4, 2002, reported "vague complaints of headaches and neck and shoulder pain," but focused on plaintiff's complaints of dysphagia and skin changes from the incision from her surgery to correct a Zenker's diverticulum. (Ex. A, HP367.) Dr. Mandpe suggested a barium swallow to rule out a recurrence of the diverticulum. (Id.) A subsequent esophagram noted a "[m]inimal small Zenker's diverticulum extending from the posterior aspect of the distal cervical esophagus. This demonstrated momentary filling with spontaneous emptying. There is no

evidence of pooling of contrast within this diverticula." (Ex. A, HP69.)  A January 8, 2003 report from Dr. Mandpe indicated that plaintiff "has dysphagia . . . maybe related to more of a pharyngeal source." (Ex. A, HP399.)  Dr. Mandpe saw plaintiff on July 7, 2003, but could not confirm her complaints of dysphagia, and noted a benign oral cavity on exam and recommended some follow-up testing.  (Ex. A, HP166.)

On April 21, 2003, Dr. Rajiv Pathak, a neurologist, noted that plaintiff indicated that she has headache pain "at the center of the back" which is there "24 hours a day. Some days are bad; some days are not so bad," but that her "vision gets blurred," and "she gets disoriented and her focus is poor." (Ex. A, HP377.)  His assessment was that she had muscle tension headaches. (Ex. A, HP379.)  On June 2, 2003, Dr. Pathak indicated that plaintiff complained that she "still gets daily [headaches]" and complained of side effects from her medication. (Ex. A, HP376.)  On September 29, 2003, he reported that plaintiff's neck pain and headaches were "muscular in nature" and their "treatment . . . mainly symptomatic." (Ex. A, HP31.)  He adjusted her medication and suggested the use of a TENS unit, an electrical nerve stimulation device.  (Id.)

On March 10, 2004, John Schroeder, PhD, a psychotherapist, noted plaintiff was "feeling depression, severe[,] and anxiety, moderate" and had "low levels of energy."  (Ex. A, HP55.)

### 3.    VPA Commissioned Independent Medical Examination of Plaintiff

As part of its determination of plaintiff's qualification for short-term disability benefits, VPA directed her to Dr.

14

Dennis Chu for an independent medical examination.  On January
21, 2003, Dr. Chu wrote a report in which he discussed his
examination of plaintiff and review of her medical records.
(Ex. A, HP300-04.)  He noted that she had a "negative MRI scan of
cervical spine, splondylosis on thoracic spine X-Rays," but that
she was somewhat functionally limited in that she was unable to
do any climbing, repetitive stooping or bending, lifting over ten
pounds.  (Ex. A, HP303.)  He also indicated that she could stand
for 30-60 minutes and sit or walk for one hour.  (Id.)  He found
her mental status to be "competent." (Id.)  Dr. Chu indicated
that he did not "feel she can return to her usual and customary
work at this point." (Ex. A, HP454.)  He recommended that "she
have a regular cervical MRI to assess for cervical disc
herniation," and noted that "[t]he prognosis for her neck and
upper back pain is fair." (Id.)

Dr. Chu was asked to supplement his report to indicate
whether plaintiff could return to work in a light duty
environment.  (Ex. A, HP455.)  He responded:

> I recommend before the patient return to work, she should
> have a cervical MRI scan to assess the cervical disc
> herniation. If the MRI scan is negative, I feel she can
> return to work part time, 4 hours a day for 2 weeks, then 6
> hours a day for 2 weeks then full time afterward. [¶ ]
> However, if the cervical MRI scan reveals cervical
> herniation, she should have a neurosurgical consultation for
> possible cervical discectomy and fusion before she can
> resume working.

(Ex. A, HP456.)  No subsequent MRI revealed any cervical disc
herniation. (Ex. A, HP58.)

### 4.   The Objective Evidence of Plaintiff's Ailments

As stated above, while plaintiff's physical therapist and
chiropractor observed a decreased range of movement and a

collapsed posture (Ex. A, HP416, HP483-86), an MRI of plaintiff's cervical soft tissue dated July 3, 2002, indicated that: "Normal cervical soft tissues. No evidence of cystic or solid abnormalities at the operative level where the Zenker's diverticulum has been resected." (Ex. A, HP72.)

She also had a normal brain MRI. (Ex. A, HP72-73.) On August 19, 2002, Dr. Boston indicated that her "[n]eurological exam [was] intact." (Ex. A, HP118.)

On October 15, 2002, plaintiff had a "Cervical Spine Series" indicating a "normal cervical spine," but a "Thoracic Spine Series" indicated "[e]arly degenerative disc changes and spondylosis in the mid thoracic spine [but] no acute changes are identified." (Ex. A, HP71.) On August 25, 2003, plaintiff had a "[n]egative CT scan of the abdomen and pelvis." (Ex. A, HP64.) On March 4, 2004, plaintiff had an additional MRI of the cervical spine which found "Early degenertive disk changes at C3-4 and C6-7. No disk herniation, central canal or neural foraminal stenosis is demonstrated." (Ex. A, HP58.)

A Speech Pathology Consultation Report was completed by Dr. Susan Langmore on March 10, 2003 (Ex. A, HP307-08), which indicated: " Normal pharyngeal swallow. Probable esophageal dysphagia and likely GERD. Possible hypersensitivity in the pharynx secondary to surgical trauma and residual irritability." (Ex. A, HP307.) An esophagogram done on May 1, 2003, indicated "slight irregularity of the upper cervical esophagus consistent with previous resection of a Zenker diverticulum," "mild tertiary peristalsis of the distal third of the thoracic esophagus but with subsequent clearance," "no

evidence of reflux with Valsalva," "otherwise negative esophagram," "no evidence of Zenker diverticulum, mucosal or mural lesions, intraluminal filling defects, or extrinsic compression." (Ex. A, HP38-39; HP360.)  On September 11, 2003, plaintiff had a "[n]egative gastrointestinal series. No evidence of esophageal lesions including diverticula, reflux, mucosal or mural lesions, or intraluminal filling defects." (Ex. A, HP61.)  On February 27, 2004, plaintiff had a normal cervical esophagogram and normal thoracic esophagogram.  (Ex. A, HP36-37.)

### 5.    Vocational Assessments of Plaintiff

In addition to Dr. Chu's analysis, the administrative record contains several reports on plaintiff's claimed vocational limitations.  An "Employee's Work Limitation Slip" dated July 25, 2002, signed by Dr. Pesko indicated that she could work part time for four hours a day so long as she was "allowed to get up and stretch every hour for 3-4 minutes," but she was precluded from "excessive or repeated" climbing, pulling, pushing, and reaching above shoulder.  (Ex. A, HP498.)  Plaintiff was also precluded from lifting over twenty pounds.  (Id.)  Dr. Pesko did not, however, explain how her medical condition imposed these limitations.

On February 10, 2003, Ms. Thorne, plaintiff's physical therapist, sent a letter to the State of California Department of Social Services, stating, among other things, that plaintiff continues to have significant complaints of pain and fatigue with any activities in a sustained position; she cannot tolerate sitting for more than thirty minutes, standing approximately forty five minutes, or walking approximately forty five minutes;

and she complains of disorientation symptoms and shakiness making handling small objects and focused concentration very difficult, particularly with computer work, her primary responsibility at work.  (Ex. A, HP338.)  Ms. Thorne specifically noted that her assessment relied on plaintiff's "subjective reports."

Soon thereafter, on February 14, 2003, Dr. Pesko sent a "Progress Report" to the State of California Department of Social Services, noting that plaintiff's updated diagnosis was "cervical segmental & thoracic segmental dysfunction, cervical myalgia, tension headaches."  (Ex. A, HP233.)  He wrote: "Patient not able to work, in process of seeing other doctors for opinions on throat & past surgery."  (Id.)  He did not provide, however, any basis for his conclusion that plaintiff's medical condition prevented her from working.

On July 25, 2003, Dr. Pesko sent a "Physician's Supplementary Certificate" indicating that "headaches & cervico-thoracic pain" continued to disable plaintiff and that she might return to work by November 1, 2003.  (Ex. A, HP238.)

Plaintiff's file contains several "Disability Slip" documents. The earliest is dated August 12, 2002, and is signed by Dr. Pesko.  He indicated that plaintiff would be on disability from August 16, 2002, through November 16, 2002, due to "neck pain & headaches."  (Ex. A, HP505.)  Dr. Pesko signed similar slips on November 6, 2002, January 9, 2003, July 15, 2003, October 20, 2003, July 19, 2004, October 18, 2004, and January 24, 2005.  (Ex. A, HP15, HP17, HP24, HP172, HP298, HP325, HP476, HP487.)  A note from Dr. Boston dated November 26, 2002, stated "Pt unable to work. Will reevaluate ~12/20/02."  (Ex. A, HP503.)

18

Although, these slips did not offer documentation of plaintiff's functional capacity.

On September 4, 2003, as noted above, a Vocational Rehabilitation Consultant at CorVel did an "Employability Assessment" based on her review of plaintiff's file, but without examining plaintiff personally.  (Ex. A, HP275-77.)  On the basis of notes in plaintiff's file that indicate that "her headaches and cervical pain are intensified with computer work and she cannot tolerate more than 30 minutes to one hour of computer work," the assessment determined that "Plaintiff appears to be vocationally limited due to her restrictions with computer work, because it is difficult for her to maintain cervical positioning at the computer." (Ex. A, HP276.)  The report determined that with accommodations, however, plaintiff "has the skills to perform within her educational level, benefit wage level and physical work capacity."  (Ex. A, HP277.)

On October 21, 2003, Healthsouth Physical Therapist Steven Nader performed the FCE of plaintiff in person.  (Ex. A, HP173-87.)  That evaluation found that plaintiff was "capable of performing work in the sedentary classification according to the U.S. Department of Labor Standards on an 8 hour day basis." (Ex. A, HP173.)

///

///

///

///

///

**ANALYSIS**

**A.   Applicable Standard of Review – Abuse of Discretion**[5]

Before reaching the merits of the parties' motions, the court must determine the appropriate standard of review to apply to VPA's denial of benefits determination.

The Plan at issue here is an employee welfare benefit plan governed by ERISA.  In Firestone Tire & Rubber Co. v. Bruch, the United States Supreme Court held that a challenge to the denial of benefits under an ERISA plan is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  489 U.S. 101, 115 (1989).  Where a plan document gives an administrator such discretionary authority, a court must apply the "abuse of discretion" or "arbitrary and capricious" standard of review to its decision to deny benefits. Id. at 111; see also Abatie v. Alta Health & Life Insur. Co., 458 F.3d 955, 963 (9th Cir. 2006).

In this case, numerous Plan provisions, as set forth above, vest sufficient discretionary power in VPA to invoke the abuse of discretion standard as defined in Firestone and Abatie. Plaintiff argues notwithstanding these provisions, that certain

---

[5]    In an ERISA benefits case, the "traditional" summary judgment standards are not necessarily appropriate.  Fed. R. Civ. P. 56.  Where, as here, the administrator's decision is reviewed for abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999) (finding that "[a]lthough there may be contradictory evidence in the record, we hold that, as a matter of law, the plan administrator did not abuse its discretion").

Plan amendments deprived the "Company" of the ability to delegate plan rights and responsibilities to VPA, and thus, discretionary authority is not properly vested in VPA.  This "failure to properly delegate" argument is irrelevant, however, given the Plan's *direct* assignment of duties to the claims administrator. In other words, the Plan grants discretion to VP directly, not through delegation.  (Ex. B, § 8(a), HP614 [providing that "The Claims Administrator shall administer the review of denied claims on the Company's behalf and make the decision on review."]; Ex. B, § 8(e), HP617 [providing "The Claims Administrator shall have the discretionary power to construe the language of the Plan and make the decision on review on behalf of the Company."]; Ex. B, § 2(a), (o), 4(f), 7(b) [vesting discretionary authority in VPA, as claims administrator, to determine "Total Disability" on the "basis of objective medical evidence" and to "process[] claims."].)[6]

---

[6]    Moreover, even if delegation were required, plaintiff's argument is based on a misreading of the Plan.  Since Section 9 was not amended, the Organization remains the "plan administrator" and "plan sponsor" and retains "the discretionary authority to control and manage the operation and administration of the Plan."  (Ex. B, § 9, HP597.)  The 5th Amendment to the Plan at Section 8 gives to the Company only "the discretionary authority to act with respect to any appeal from a denial of benefits," and "the authority to determine eligibility for benefits and to construe the terms of the Plan."  (Ex. B, § 8(a), HP614 (as amended December 2002).)  In other words, the 5th Amendment to the Plan does not strip the Organization of all of its rights and responsibilities under the Plan, but transfers only specific duties from the Organization to the Company.  It is not contrary to ERISA for there to be more than one named fiduciary, as ERISA provides that a plan "shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."  29 U.S.C. § 1102(a); see also 29 U.S.C. § 1105(c)(1)(B); Madden v. ITT Long Term Disability Plan for Salaried Employees, 914 F.2d 1279, 1283 (9th Cir. 1990). As such, the 5th Amendment to the Plan creates no barrier to the

Indeed, plaintiff's argument ignores that the language in Section 8(e) of the Plan is precisely the language courts have construed as unambiguously granting sufficient discretion to VPA to warrant abuse of discretion review under <u>Firestone</u>.  In <u>LaMantia v. Voluntary Plan Administrators, Inc.</u>, the Ninth Circuit held that the Plan gave "VPA the discretionary power to construe the language of the Plan and to make the decision on review so the abuse of discretion standard would normally apply."  401 F.3d 1114, 1123 (9th Cir. 2005) (internal quotation marks omitted).  Numerous other courts have found similarly--that this Plan, both originally and as amended, sufficiently grants discretion to VPA.  <u>Carter v. Hewlett-Packard Co.</u>, 2007 U.S. Dist. LEXIS 3249, at *1 (N.D. Cal. Jan. 1, 2007) (holding this Plan "unambiguously grants discretionary authority to VPA and, therefore, the abuse of discretion standard applied"); <u>accord</u> <u>Tabatabai v. Hewlett-Packard Co. Disability Plan</u>, 2006 U.S. Dist. LEXIS 66110, at *6 (N.D. Cal. Sept. 1, 2006); <u>Moore v. Hewlett-Packard Co.</u>, 2000 WL 361680 (D. Pa. Apr. 6, 2000); <u>Guthrie v. Hewlett-Packard Co. Employee Benefits Organization</u>, 773 F. Supp. 1414, 1415 (D. Colo. 1991).

Plaintiff alternatively argues that because VPA is the "Organization's" agent, pursuant to the ASA, VPA must share the Organization's conflict of interest.  Such a conflict, plaintiff contends, mandates application of de novo review pursuant to

---

delegation of duties to VPA under the Plan, although none is required because the claims administrator was assigned its responsibilities and discretion directly.

1    <u>Abatie</u>.[7]  Plaintiff is incorrect.  The conflict of

2    interest to which <u>Abatie</u> refers, is one where an insurer both

3    funds and administers the Plan.  <u>Abatie</u>, 458 F.3d at 958, 965-66;

4    <u>see also</u> <u>Coleman-Lea v. Metropolitan Life Ins. Co.</u>, 2006 U.S.

5    Dist. LEXIS 89352, *11-12 (N.D. Cal. Dec. 11, 2006) ("no evidence

6    of a conflict of interest beyond the apparent conflict which

7    exists when the insurer both funds and administers the plan");

8    <u>Shemano-Krup v. Mutual of Omaha Ins.</u>, 2006 U.S. Dist. LEXIS

9    84352, *29-31 (N.D. Cal. Nov. 20, 2006) (denying

10   discovery where there was no evidence of a conflict of interest

11   beyond the "apparent conflict which exists when the insurer both

12   funds and administers the plan").  Plaintiff cannot argue that

13   such a funding mechanism exists here as benefits are not paid

14   from VPA's assets; rather, HP makes contributions to the Plan

15   that are held in a trust, out of which the Organization pays

16   benefits.  (Ex. B, § 4(e), HP581.)

17        While certainly the doctrine of respondeat superior applies

18   (plaintiff is suing the Plan for VPA's allegedly improper denial

19   of benefits), plaintiff cites no authority for the proposition

20   that a structural conflict of interest is transferred from the

21   funding source of a Plan to the claims administrator, where the

22   administrator is not paid on the basis of claims denied.  Courts

23   have recognized that steps can be taken to prevent a claims

24

25        _____
26        [7]    Plaintiff makes this argument in support of her
     position that de novo review is the correct standard of review in
     this case; however, under <u>Abatie</u>, a conflict of interest finding
27   would not dictate application of de novo review but rather
     require a less deferential review under abuse of discretion
28   (sometimes referred to as "heightened" abuse of discretion
     review).  <u>Abatie</u>, 458 F.3d at 972.

administrator from laboring under a conflict of

interest.  <u>See, e.g.</u>, <u>Sin v. Metropolitan Life Ins.</u>, 2006 U.S.

Dist. LEXIS 90885, at *8 (D. Or. Dec. 13, 2006) ("Since [the

claims administrator] has no economic interest in the outcome of

plaintiff's claim, no conflict of interest arises."); <u>see also</u>

<u>Sandoval v. Aetna Life and Casualty Ins. Co.</u>, 967 F.2d 377,

378 (10th Cir. 1992) (claims administrator "received flat fees

for processing claims and thus had no direct financial incentive

to deny or to terminate benefits to plan participants").

Plaintiff's argument ignores the specific steps taken by

defendant to prevent VPA from having an economic incentive in the

outcome of claims decisions, namely, VPA's compensation through a

flat fee and the payment of benefits out of the Plan's trust, not

VPA's assets.  (Ex. B, § 4(e)-(f), HP581; Ex. D, § VII.A-B,

HP641.)  Here, VPA has no conflict of interest because it has no

economic interest in the denial of claims.  Indeed, if an agency

theory defeated the discretion granted to VPA, then no

administrator could ever be shielded from the funding source's

conflict of interest.  Plaintiff's "agency theory" does not

provide a basis for de novo review in this case.

    As a final argument in favor of application of de novo

review, plaintiff contends that under <u>Abatie</u>, this court must

apply de novo review due to "procedural irregularities" in this

case, specifically, VPA's untimely issuance of its denials of

plaintiff's benefits claim.  Plaintiff's argument is unavailing

for several reasons.  First, plaintiff reads <u>Abatie</u> too broadly.

In <u>Abatie</u>, the Ninth Circuit held that "[w]hen an administrator

engages in *wholesale* and *flagrant* violations of the procedural

24

requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review de novo the administrator's decision to deny benefits." 458 F.3d at 971 (emphasis added). The court recognized that such instances are "rare," and "in the more ordinary situation in which a plan administrator has exercised discretion, but in doing so, has made procedural errors," de novo review is *not* mandated. Id. at 972. The court further held that "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." Id. (internal quotation marks omitted).

As an example of what constitutes "wholesale and flagrant violations of the procedural requirements of ERISA," the Ninth Circuit cited the facts in Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir. 1984), noting that in Blau, "the administrator had kept the policy details secret from the employees, offered them no claims procedure, and did not provide them in writing the relevant plan information." Abatie, 458 F.3d at 971. Obviously, no such failure "to comply with virtually every applicable mandate of ERISA" is at issue here, and an abuse of discretion standard remains appropriate. Id.

Indeed, even before Abatie, under two recent Ninth Circuit decisions (Jebian and Gatti) the violations of time limits like the ones plaintiff claims here would not result in application of the de novo standard of review. See Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan, 349 F.3d 1098

(9th Cir. 2003) (applying de novo review only because the plan explicitly provided that a claim is "deemed to have been denied on review" if the administrator neither responded to the appeal within sixty days nor informed the claimant of the need for a sixty day extension [no such "deemed denied" provision exists in this Plan]");[8] <u>Gatti v. Reliance Standard Life Insur. Co.</u>, 415 F.3d 978, 982, 985 (9th Cir. 2005) (reversing district court's application of de novo review, finding, despite the fact that the claims administrator issued its decision 279 days after the claimant submitted her request for administrative review, that "violations of time limits established in [the previous version of the regulations] are insufficient to alter the standard of review," rather violations must be so "flagrant as to alter the substantive relationship between the employer and employee,

---

[8]     Following <u>Jebian</u>, HP amended its Plan to eliminate the "deemed denied" language discussed in that case.  Subsequently, courts in this circuit have determined that, where the applicable ERISA regulations do not contain the "deemed denied" language, a technical violation of the ERISA time limits offers no basis for a finding that the claims administrator did not exercise its discretion, the predicate for applying a de novo standard of review. <u>See, e.g.</u>, <u>Freitas v. Delta Family-Care Disability & Survivor</u>, 2006 U.S. Dist. LEXIS 29902, at *6-8 & n.1 (E.D. Cal. May 15, 2006) (noting that because ERISA no longer deemed an appeal denied on the expiration of a time limit, plaintiff's argument for de novo review after the plan failed to issue a timely appeal decision was even less persuasive); <u>Peterson v. Fed. Express Corp. Long Term Disability Plan</u>, 2006 U.S. Dist. LEXIS 34343, at *17-18 (D. Ariz. May 24, 2006) (in analyzing whether the <u>Gatti</u> court's analysis should be extended to cases arising under the amended regulations, found that the court would not require "de novo review every time a plan administrator violates ERISA, no matter how inconsequential the violation"); <u>Oman v. Intel Corp. Long Term Disability Benefit Plan</u>, 2004 U.S. Dist. LEXIS 21909, *10-11 (D. Ore. Oct. 21, 2004) (pre-<u>Gatti</u> case contrasting the regulations at issue in <u>Jebian</u> with the current regulations in which "all references to claims being 'deemed denied' due to expiration of time limits has been removed.").

thereby causing the beneficiary substantive harm").

Here, the delay in deciding plaintiff's claim was minor[9] and largely due to plaintiff's counsel's requests for additional time to provide supporting evidence of plaintiff's aliments.  Once plaintiff completed her submission of records, VPA responded promptly with its final denial of her claim.  A brief overview of the pertinent facts establishes these points:

VPA received plaintiff's claim for LTD benefits and her Attending Physician's Statement of Disability on April 22, 2003. (Ex. A, HP1, HP430, HP433.)  Plaintiff submitted additional information on June 18, 2003, and spoke with Ms. Kennedy at VPA on September 4, 2003, about her application for Social Security benefits.  (Ex. A, HP1-3, HP6.)  On September 12, 2003, plaintiff sent in verification of her appointment with Social Security, and VPA called her to set up a functional capacity evaluation.  (Ex. A, HP6.)  VPA received additional medical records from plaintiff's doctors up through September 23, 2003.  (Ex. A, HP6.) Plaintiff communicated with VPA again regarding her Social Security application on September 25 and 26.  (Ex. A, HP6, HP267.)  Although VPA had set up a functional capacity evaluation for plaintiff on September 12, when plaintiff arrived for that evaluation on October 3 she expressed concerns about undergoing the testing because of the limitations her care providers had placed on her activities. (Ex. A, HP7.)  After procuring

---

[9]     Defendant does not dispute that VPA overran the applicable time limits; generally, the Plan requires that VPA make its initial determination within 45 days, and if additional time for processing is required, the determination period may be extended to up to 105 days if certain procedures are met.  (Ex. B, § 7(b), HP612.)

permission from her healthcare providers, that examination finally took place on October 21. (Ex. A, HP7, HP263-66.)

After reviewing the FCE, VPA initially denied her claim on October 27, 2003. (Ex. A, HP209-13.) At that time, plaintiff was told that she would have until April 23, 2004, to appeal the denial of her claim. (Id.) On April 22, 2004, plaintiff appealed the denial of her claim and requested additional time to provide VPA with more information. (Ex. A, HP99-102.) The letter requested an open-ended extension: "I request additional time to provide further information that could help this claim be more properly and favorably resolved." (Ex. A, HP102.) Plaintiff's attorney sent an additional letter on May 4, 2004, enclosing additional medical records and indicating that he expected "to provide further information besides the enclosed." (Ex. A, HP57.) On May 17, May 19 and July 23, 2004, counsel for plaintiff submitted additional documentation regarding her condition to VPA. (Ex. A, HP23, HP25, HP29-30.)

On August 2, 2004, VPA called plaintiff's counsel and left a message inquiring as to whether additional information was forthcoming. (Ex. A, HP4, 20.) Plaintiff's counsel did not return that call, but on September 19, 2004, he sent a letter to VPA stating that "[i]t would seem that the time frame for determining this claim is being significantly overrun." (Ex. A, HP22.) However, on October 28, 2004, plaintiff's counsel submitted additional documentation to support plaintiff's disability claim to VPA. (Ex. A, HP16.) On November 4, 2004, VPA sent plaintiff's counsel a letter indicating that VPA had called his office in August (see HP4) to ask if additional

28

information on plaintiff's appeal was forthcoming and

inquiring into the status of her Social Security Disability

claim.  (Ex. A, HP20.)  That letter also indicated that

VPA had received another extension request from plaintiff's

counsel's office on November 1, 2004.  (Id.)

Plaintiff's counsel did not respond until January 20, 2005.
(Ex. A, HP13.)  On January 30, her counsel submitted additional
information and noted:

> I believe you may think I continue to request additional
> time. I did request additional time back when I made the
> formal appeal of 4/22/04.  However, I was able to provide
> additional medical information over the following month or
> so.  [¶ ] At this point, though, it appears that Ms. Riffey
> has significantly increased psychiatric symptoms,
> resulting from her original problems. I am not sure how you
> want to handle this, but I could probably provide some
> specialized medical information in this regard within a
> limited time frame – so if you want to agree to hold this
> record open yet longer, it may be a good idea all the way
> around.

(Ex. A, HP14.)

On March 2, 2005, VPA sent a letter to plaintiff's attorney
advising of its decision to deny plaintiff's appeal.  (Ex. A,
HP10-12.)

Under these facts, the court cannot find that the procedural
violations of the Plan's time limits are sufficient to require
application of de novo review pursuant to Abatie.  While VPA
overran the applicable time limits, it was regularly in contact
with plaintiff during all relevant times and can only be
described as engaging "in an ongoing, good faith exchange of
information between [administrator] and [claimant]."  Abatie, 458
F.3d at 972.  As such, "the court should give the [VPA's]

decision broad deference notwithstanding [m]inor irregularities."
Id.

Therefore, because the Plan clearly delegates discretion to
VPA to render claims decisions and because there were no
procedural irregularities sufficient to alter the standard of
review, the court finds that abuse of discretion is the
appropriate standard of review in this case.[10]

### B.   **VPA's Decision to Deny LTD Benefits**

Applying the abuse of discretion standard of review, the
sole issue before the court is whether VPA abused its discretion,
or in other words, acted arbitrarily and capriciously, in denying
plaintiff's disability claim.  An administrator's decision is an

_____

[10]   Plaintiff argues alternatively that if the court does
not apply de novo review, it should nonetheless apply a more
"searching" or "heightened" review under the abuse of discretion
standard, citing Abatie.  In Abatie, the Ninth Circuit recognized
that a heightened review under abuse of discretion is appropriate
where there are procedural errors which may not rise to the level
of requiring application of de novo review (i.e., they are not so
"wholesale" or "flagrant") but nonetheless are matters that
should be "weighed in deciding whether an administrator's
decision was an abuse of discretion" (i.e., a "conflict of
interest").  458 F.3d at 972 (emphasis added).  Here, plaintiff
claims VPA's request for additional information before
determining plaintiff's initial LTD claim warrants more searching
review, and that VPA's reading of the FCE and other portions of
the record constituted "procedural errors" that should affect the
court's application of abuse of discretion review.  The court
disagrees.  Plaintiff's latter argument is not procedural.
Abatie's holding does apply when the claimant simply disagrees
with the administrator's interpretation of the record.  458 F.3d
at 971 (distinguishing the case where a claimant challenges
procedural errors in an administrator's review from the more
common situation "when a plan participant disagrees with an
administrator's interpretation of the record or with its
application of the plan's terms to the facts" [only the former
can possibly impact the standard of review]).  As to plaintiff's
first argument, VPA did not commit a procedural error in
obtaining all relevant medical records.  Procurement of the
records was required by the Plan in order for VPA to make an
informed decision on plaintiff's claim.

abuse of discretion only where it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3rd Cir. 1993) (citations omitted); Taft v. Equitable Life Insur. Co., 9 F.3d 1469, 1472 (9th Cir. 1998).  So long as the administrator's decision has a rational basis, the court is not free to substitute its own judgment for that of the administrator in determining the eligibility for plan benefits even if the court disagrees with that decision.  Id.  Under the abuse of discretion standard, the only issue is whether, on the evidence considered, the administrator's determination was "reasonable." Horan v. Kaiser Steel Retirement Plan, 947 F.2d 1412, 1417 (9th Cir. 1991); see also Clark v. Wash. Teamsters Welfare Trust, 8 F.3d 1429, 1432 (9th Cir. 1993) ("Our inquiry is not into whose interpretation of plan documents is most persuasive, but whether the plan administrator's interpretation is unreasonable."). Moreover, the scope of review under the arbitrary and capricious standard is very limited.  The focus of an abuse of discretion inquiry is the administrator's analysis of the administrative record--it is not an inquiry into the underlying facts.  Alford v. DCH Found Group Long-Term Disability Plan, 311 F.3d 955, 957 (9th Cir. 2002).

Here, the Plan provides that an individual qualifies for LTD benefits only if, based upon "objective medical evidence," that individual is "continuously unable to perform any occupation for which he or she is or may become qualified by reason of his or her education, training or experience."  (Ex. B, § 2(o)(ii), HP573.)  In this case, the court finds that VPA's decision was

compelled by the terms of the Plan and as such, it was neither arbitrary nor capricious.

Although plaintiff complained to numerous doctors of headaches and neck and back pain, there is little *objective*[11] medical evidence in the record of those subjective reports.  See e.g. Jordan v. Northrup Grumman Co. Welfare Benefit Plan, 370 F.3d 869, 878 (9th Cir. 2004) (recognizing that an administrator may ultimately reject physicians' diagnoses that rely on the patient's subjective reports of pain).[12]  Indeed, plaintiff's lab tests and other screenings were all essentially normal, except for an MRI of the cervical spine which found "[e]arly degenertive disk changes at C3-4 and C6-7," but, significantly, revealed "*[n]o* disk herniation, central canal or neural foraminal stenosis" (Ex. A, HP58 [emphasis added]), and a "Thoracic Spine Series" that indicated "[e]arly degenerative disc changes and spondylosis in the mid thoracic spine" but identified "*[n]o* acute changes."  (Ex. A, HP71; *compare* HP64, HP72-73, HP118 [emphasis added].)

---

[11]   Moore, 2000 WL 361680 at *7 (describing "objective medical evidence" as for example, "lab test results, X-rays, consulting physician's reports, or physical therapy results" or "any other *data* that could be considered objective evidence perceived without distortion of personal feelings, prejudices or interpretations") (emphasis added).

[12]   Plaintiff tries to distinguish Jordan, arguing that this case is not a "finding-less case of fibromyalgia" but rather a case involving a "serious" Zenker's diverticulum.  However, plaintiff is not claiming that an esophageal diverticulum disabled her; instead, she is claiming disability on the basis of "pain" she claims resulted from surgery to remove that diverticulum.  For the reasons set forth below, she has not demonstrated by objective medical evidence that her pain totally disables her, and in that regard, this case is analogous to Jordan.

Likewise, there is no objective medical evidence of plaintiff's "memory and concentration deficits" beyond her own subjective complaints.

In addition, while her physical therapist and chiropractor observed a decreased range of movement and a collapsed posture (Ex. A, HP416, HP483-86), they never explained how those limitations, which had improved by the time she left physical therapy in May 2003 (Ex. A, HP333), prevented her from performing in a sedentary position.

In that latter regard, there is also little evidence of how plaintiff's claimed medical issues prevented her from performing any occupation for which she was qualified or could become qualified based on her education, training or experience.   There is substantial evidence in the record that plaintiff's conditions did not prevent her from working at a sedentary job. (Ex. A, HP 211-12.)   The independent examiner who performed plaintiff's FCE, which occurred closest to the date at which she was required to demonstrate total disability, stated that she was "capable of performing work in the sedentary classification according to the U.S. Department of Labor Standards on an 8 hour day basis."   (Ex. A, HP173.)   Even the previous functional capacity file review by CorVel determined that with accommodations plaintiff "has the skills to perform within her educational level, benefit wage level and physical work capacity."   (Ex. A, HP277.)   Moreover, the notes from her doctors are largely conclusory statements that she was not able to work, without discussion of how any conditions affected her *functional*

*capacity*.  (Ex. A, HP15, HP17, HP24, HP172, HP233, HP238, HP298, HP325, HP476, HP487, HP505.)

Plaintiff argues, to the contrary, that VPA either misrepresented the evidence or omitted to discuss items that she views as crucial to her claim in its denials, and that this was an abuse of discretion.  First, plaintiff argues VPA misrepresented and misinterpreted the FCE performed by Healthsouth.  Plaintiff concedes that the examiner concluded that she was capable of performing work in the sedentary classification according to U.S. Department of Labor Standards on an 8 hour daily basis.  (Ex. A, HP173.)  However, she argues that VPA should have interpreted the examiner's report as contradicting its conclusion, because plaintiff reported pain during, and increased pain following, the examination.  Likewise, plaintiff argues that her reports to the examiner regarding her own perceived abilities should have been considered in the conclusion.  Id.  Plaintiff's reports of subjective feelings are not "objective medical evidence" required by the Plan--such reports of pain are not "evidence establishing facts or conditions as perceived without distortion by personal feelings, prejudices or interpretations," as the Plan defines "objective medical evidence."  (Ex. B, § 2(o), HP574.)  The Plan mandates that VPA's review focus on objectively measurable criteria, and thus, plaintiff's argument is unavailing.

Plaintiff also argues that her posture and muscular tenderness should have affected the FCE examiner's conclusion; yet, plaintiff does not explain how that aliment rendered her disabled from any occupation.  Nor does she explain why a

34

need "to sit frequently to rest from testing in a standing position" or the inability to "lift 10 lbs. safely on a frequent basis" would prevent her from performing in a sedentary occupation.  She also places great emphasis on the examiner's observation that she "was observed to lose her balance momentarily on a frequent basis due to reports of dizziness and back spasms."  (Pl.'s MSJ at 10, 14 [citing HP175].)  However, she does not indicate how that precluded her from working in a sedentary position.

In addition, plaintiff relies on Dr. Chu's assessment, but ignores his finding in January of 2003 that she could "return to work part time, 4 hours a day for 2 weeks, then 6 hours a day for 2 weeks then full time afterward."  (Ex. A, HP425.)  Clearly, Dr. Chu did not determine that she was disabled from a sedentary position.  (Id.)

Plaintiff also cites to her physical therapist's initial evaluation of her in January 2003 and the February 10, 2003 report to the California Disability agency as evidence of her claim.  However, she does not explain how those reports remain relevant when the same physical therapist reported improvement and a normal range of motion in her report *discharging* plaintiff from physical therapy in May 2003.  (Ex. A, HP333.)  Moreover, as the physical therapist stated in her letter to the California disability agency, her findings were based "solely on clinical findings and patients [sic] subjective reports."  (Ex A, HP338.)  Like the above, nothing in these records evidences "total disability" on the basis of objective medical evidence.

Plaintiff further contends that Healthsouth's FCE contradicted the review of her file by CorVel.  However, it cannot be considered an abuse of discretion for VPA to give greater weight to an in-person examination over a review of records that were not completely up to date.  Indeed, the restrictions and limitations provided to CorVel for its assessment derived from Dr. Chu's examination in January 2003, but plaintiff's caregivers observed improvements over the following months (Ex. A, HP333), which improvements were reflected in the most-current assessment by Healthsouth.

Plaintiff also claims, more generally, that VPA did not properly address various medical records in its letters denying her claim (Pl.'s MSJ at 15-16).  While it is true that VPA did not mention every medical record in plaintiff's extensive file of over 500 pages (HP 10-12, HP209-13) in issuing its denials of plaintiff's benefits claim, what is relevant is that plaintiff has not pointed to any objective medical evidence of her claimed disability that VPA should have addressed but did not.[13]

---

[13]  To the extent plaintiff alternatively argues that this court should find error in VPA's failure to consider her claims of depression as a basis for an award of benefits, the court finds plaintiff's arguments wholly unpersuasive.  By the express terms of the Plan, plaintiff did not meet the hospitalization requirement of the mental illness limitations of the Plan, and thus, any claimed depression was properly excluded from consideration by VPA.  (Ex. B, § 2(o), HP574.)  Furthermore, even if plaintiff's depression was caused by her physical pain and disability, such depression is nonetheless included in the Plan's definition of mental illness and specifically excluded from coverage after the first 52 weeks.  (Ex. B, § 2(o)(A)(1), HP575.) As such, VPA, properly, did not consider any claim of disability "caused or contributed to" by plaintiff's depression and anxiety. (Ex. B, § 2(o)(A), HP574-75.)

1    In sum, plaintiff continues to rely on her subjective

2 complaints of pain to support her claim for long-term disability

3 benefits, and she still has not identified any objective medical

4 evidence that she is totally disabled as defined by the Plan.

5 The burden of production rests with plaintiff (Ex. B, § 8(b),

6 HP615), and her failure to support her claim then, and even now,

7 with objective medical evidence is fatal to her claim herein.

8 See e.g. Mitchell v. Aetna Life Insur. Co., 359 F. Supp. 2d 880,

9 890 (C.D. Cal. 2005) (granting summary judgment in favor of

10 defendants on the grounds the plan administrator did not abuse

11 its discretion in denying employee's LTD benefits claim based on

12 the employee's "subjective reports of pain and her doctors'

13 unexplained conclusory opinions that she was disabled from

14 performing any job").

15                              **CONCLUSION**

16    For the foregoing reasons, the court GRANTS defendant's

17 motion for summary judgment and DENIES plaintiff's motion for

18 summary judgment.  The Clerk of the Court is directed to close

19 this file.

20    IT IS SO ORDERED.

21  DATED: March 26, 2007

22

23                                    _____

24                                    FRANK C. DAMRELL, JR.
                                      UNITED STATES DISTRICT JUDGE
25

26

27

28

                                    37